# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 16, 2014

## STATE OF TENNESSEE v. TIMOTHY ALLEN JOHNSON

**Appeal from the Criminal Court for Davidson County**
**No. 2012B1770     Cheryl A. Blackburn, Judge**

———————————

**No. M2014-00766-CCA-R3-CD - Filed March 2, 2015**

———————————

The defendant, Timothy Allen Johnson, was convicted of one count of tampering with evidence, a Class C felony. He was sentenced as a persistent offender to a twelve-year sentence. On appeal, the defendant argues that the evidence is insufficient to support his conviction. After a thorough review of the record, the briefs of the parties, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J. and ROBERT W. WEDEMEYER, J., joined.

Nicholas Tuck McGregor, Nashville, Tennessee, for the appellant, Timothy Allen Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Jeff Burks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts and Procedural History

This case arose out of an incident where the defendant agreed to obtain crack cocaine for two undercover police officers to purchase. Detective Michael Donaldson testified that on the evening of March 27, 2012, he and his partner, Detective Brittany Shoesmith, were

participating in a "buy-bust" operation. In a "buy-bust" operation, undercover detectives pose as drug users to purchase a controlled substance from a target. Once the purchase is complete, a "takedown team" immediately arrests the seller. The members of the takedown team wear "clearly marked raid gear" identifying themselves as police officers, and they move into position to arrest the seller after receiving a "takedown signal" from the undercover officers. On the evening of the incident, Detectives Donaldson and Shoesmith were playing the role of drug purchasers. In order to maintain their cover, the detectives were in an unmarked vehicle that did not have police lights or sirens.

After receiving reports of drug sales in the area of Waverly and Wedgewood, Detectives Donaldson and Shoesmith proceeded to the area to see if they could purchase drugs. When they arrived, the detectives pulled into an alley and encountered a female walking through the alley. Detective Donaldson asked the woman if she knew where he could purchase drugs. The woman gestured toward three individuals, one of whom was the defendant, standing near the end of the alley. Detective Donaldson approached the group on foot, and the defendant was on a cellular telephone. Detective Donaldson addressed the group, stating that he needed "a thirty."[1] The defendant replied that he currently did not have any drugs but was attempting to get more. After the defendant said he needed to "re-up," Detective Donaldson walked away, waited for ten minutes, and then returned to the group.

When he returned, Detective Donaldson again asked the defendant for drugs. The defendant said that he still did not have any but that he knew a place where he could take Detective Donaldson to get the drugs. They walked across the street, where the defendant told Detective Donaldson to wait while the defendant approached a house. Detective Donaldson witnessed the defendant knock on the door, saw the door open, and saw someone speak with the defendant. The defendant returned to Detective Donaldson and told him that he was unable to acquire drugs but that he knew of a third location to visit, which would require Detective Donaldson to drive. After telling Detective Donaldson that the location was close, the defendant entered the vehicle with Detectives Donaldson and Shoesmith.

The three drove to a gas station parking lot near Fairfield and Lafayette streets, and the detectives gave the defendant thirty dollars of photocopied "buy money." After making a phone call, the defendant exited the vehicle, and the detectives saw the defendant go into "the project[s] somewhere." The detectives lost sight of the defendant and waited in the car for his return.

While the detectives were waiting, a "Flex team, which is an entire team of marked officers in cars that have blue lights" and uniforms, pulled into the parking lot. Officers were

---

[1] Detective Donaldson testified that "a thirty" meant thirty dollars' worth of cocaine.

patrolling the parking lot on foot, and "seven or eight marked officers" were standing in the parking lot when the defendant returned. After seeing the officers, the defendant became panicked. He told the detectives, "[W]e got to go, we got to go." Detective Donaldson told the defendant that he either needed to receive the drugs or his money before leaving the gas station, to which the defendant replied, "[W]e're good, we're good, we got to go." The defendant directed Detective Shoesmith to exit the gas station, and she began driving.

As they began driving, Detective Donaldson observed the defendant in the backseat with "a bag of crack" that appeared to be an eighth of an ounce. The drugs were in a corner portion of a ziploc baggie that had been torn away from the main bag. When Detective Donaldson remarked that the amount seemed like "a lot for a thirty[,]" the defendant responded that not all of the drugs were for Detective Donaldson. The defendant opened the bag and gave Detective Donaldson thirty dollars worth of crack cocaine. Detective Donaldson secured the drugs by placing them into an ashtray, and Detective Shoesmith continued to drive. Detective Donaldson then gave the "takedown" signal.

An officer on the takedown team pulled in front of the vehicle and activated his blue lights. Detective Donaldson heard the defendant say, "[I]t's the vice, it's the vice." Detective Donaldson turned toward the backseat and witnessed the defendant placing both the plastic bag and its contents into his mouth in an attempt to ingest the remaining amount of drugs. Detective Donaldson began to wrestle with the defendant to prevent him from consuming the drugs as the takedown team was running toward the vehicle. The takedown team wore "raid gear that sa[id] police all over the front of it and all over the back of it." The defendant fought with the officers who attempted to remove him from the vehicle, and officers had to forcibly subdue and handcuff the defendant. Before the takedown team was able to secure the defendant, he was able to consume or ingest the remaining drugs.

On cross-examination, Detective Donaldson testified that he did not attempt to stop the defendant from swallowing the contents of the plastic bag until after the takedown team had turned on their blue lights and approached the vehicle in raid gear.

Detective Shoesmith testified that she was working undercover with Detective Donaldson on the evening of the incident and that she was driving their undercover vehicle. Detective Shoesmith recalled that neither she nor Detective Donaldson wore anything identifying themselves as police officers but that other officers were in the area wearing "clearly identifying police raid gear." Detective Shoesmith identified the defendant as the individual who entered the vehicle with her and Detective Donaldson. The defendant directed Detective Shoesmith to drive to a Shell gas station so that he could purchase crack cocaine with the thirty dollars Detective Donaldson had given him.

3

Detective Shoesmith did not recall if there were other police officers in the Shell station parking lot when the defendant returned, and she did not recall the defendant saying, "[W]e've got to get out of here."

When the defendant returned to the vehicle and got into the backseat, Detective Shoesmith witnessed him remove a "small plastic clear baggy" from his clothing. The substance looked "off white" and appeared to be crack cocaine. After the defendant gave some of the drugs to Detective Donaldson, he began to twist the bag as if to close it. Detective Donaldson gave the takedown signal, and officers wearing clearly marked police gear began to move toward the vehicle. When the other officers approached the vehicle, Detective Shoesmith observed the defendant place the entire "baggy" into his mouth.

Detective William Loucks, Jr., testified that he was a member of the takedown team on the evening of the incident. He was in a vehicle alone, and he was wearing a black police jacket that contained several patches identifying him as a Metro Police officer. Through a recording device, Detective Loucks was able to listen to the conversation between the defendant and Detective Donaldson regarding the crack cocaine. He heard the exchange between the defendant and Detective Donaldson during which the defendant informed Detective Donaldson that the crack cocaine was not all for him. After receiving the takedown signal, Detective Loucks drove to the rear of Detective Shoesmith's vehicle and "locked" his bumper onto the car, immobilizing it. When he approached, Detective Loucks had activated his blue lights and sirens. Detective Loucks identified the defendant as the individual who was in the backseat of the detectives' car.

Detective Loucks was the first officer to approach the vehicle and attempt to open the door to the backseat. He observed the defendant with his right hand over his mouth, and Detective Donaldson advised him that the defendant had just put the drugs into his mouth. After Detective Loucks unlocked the back door, he ordered the defendant "numerous" times to "spit it out, put your hands down, get out of the car, stop what you're doing, step out of the car, police." The defendant continued "locking" his right hand over his mouth, and Detective Loucks attempted to remove the defendant from the vehicle and to remove the defendant's hand from his mouth.

After thirty seconds, Detective Loucks was able to pull the defendant's hand away from his mouth and remove him from the vehicle and place him onto the pavement. As Detective Loucks attempted to place the defendant's hands behind his back and take him into custody, the defendant continued to struggle. The defendant managed to place his hands around the front of his mouth and throat area and "began to almost try to push up off the pavement." Detective Loucks applied "a pressure point control technique, driving" his thumb behind the defendant's ear, which contained "a sensitive nerve pressure point area."

4

After applying the pressure point control for "about ten to fifteen seconds," Detective Loucks was able to place the defendant's hands behind his back and handcuff him. He agreed that he was not able to recover anything from the defendant's mouth.

Once the defendant was handcuffed, officers transported him to General Hospital so that he could receive treatment for the drugs that he ingested. Detective Donaldson gave the substance that he received from the defendant to Detective Loucks, and Detective Loucks assisted in field-testing the substance. The substance tested positive for cocaine base.

Detective James McDugle testified that he also was a member of the takedown team on the evening of the incident. Detective McDugle described his role in the takedown as "supportive." Detective McDugle was not in the Shell station parking lot when he heard the takedown signal, and by the time he arrived at Detectives Donaldson and Shoesmith's vehicle, several other narcotics officers had already arrived. The defendant was already in custody when Detective McDugle arrived at the vehicle, and he did not observe any action taken by the defendant before arriving at the scene. Detective McDugle submitted a "white[,] rock[-]like substance" into evidence.

Special Agent Denotria Patterson, a forensic scientist with the Tennessee Bureau of Investigation ("TBI") testified that her job was to test items submitted to the lab to detect the presence of any controlled or non-controlled substance. Special Agent Patterson tested the substance submitted by Detectives Loucks, Donaldson, and McDugle and found that it was cocaine-based.

Dr. Lawrence Kleuser, an emergency room physician, testified for the defense. He stated that he treated the defendant when he was admitted to the hospital, although he did not specifically recall treating the defendant. He testified that the most common symptoms of a cocaine overdose were hypertension and tachycardia and that the defendant's medical record indicated that he exhibited neither of these symptoms. The defendant told Dr. Kleuser that he was a daily cocaine user, which Dr. Kleuser agreed could raise the level of the defendant's tolerance of cocaine. Dr. Kleuser also agreed that the defendant did not display signs that he was suffering from a drug overdose. He testified that the defendant denied ingesting anything.

On cross-examination, Dr. Kleuser agreed that he did not recall treating the defendant and that his testimony was based upon the defendant's medical records. He agreed that if the defendant were to ingest drugs contained in a plastic bag, the bag could prevent the drugs from entering the defendant's system.

At the conclusion of the proof, the jury found the defendant guilty of tampering with

5

evidence and resisting arrest. The trial court sentenced the defendant to twelve years' incarceration for tampering with evidence and six months' incarceration for resisting arrest. The defendant filed a motion for new trial, which the trial court denied. He timely filed this appeal, in which he challenges only the sufficiency of the evidence regarding his conviction for tampering with evidence.

## II. Analysis

### Sufficiency of the Evidence

The defendant contends that the evidence is insufficient to support his conviction for tampering with evidence. Specifically, he argues that Detectives Donaldson and Shoesmith did not identify themselves as police officers and that he was unaware of the presence of the uniformed takedown team when he allegedly swallowed the item.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after reviewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Tennessee Code Annotated section 39-16-503(a)(1) (2010) provides that "[i]t is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to . . . [a]lter, destroy, or conceal any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding[.]" In order to obtain a conviction for tampering with evidence, the State must prove "three elements beyond a reasonable doubt—'timing, action, and intent.'" *State v. Hawkins*, 406 S.W.3d 121, 132 (Tenn. 2013) (quoting *State v. Gonzales*, 2000 UT App. 136,

¶ 11, 2 P.3d 954, 957) (Utah App. 2000)). The "timing" element requires the State to prove that the defendant acted *after* forming a belief that an investigation or proceeding was pending or in progress. *Hawkins*, 406 S.W.3d at 132. "The 'action' element requires alteration, destruction, or concealment." *Id.* The "intent" element requires that the defendant intend for his actions "to hinder the investigation or official proceeding by impairing the record's, document's, or thing's 'verity, legibility, or availability as evidence." *Id.*

Viewed in the light most favorable to the State, the evidence shows that the defendant got into a vehicle with Detectives Donaldson and Shoesmith in order to acquire crack cocaine for them. After returning with "a bag of crack," the defendant gave Detective Donaldson a portion of the substance and kept the remainder for himself. Once he received the drugs, Detective Donaldson gave the takedown signal, and officers began to approach the vehicle with their lights and sirens activated. Detective Donaldson testified that the defendant, upon seeing the blue lights, exclaimed, "[I]t's the vice, it's the vice." Detective Donaldson then turned toward the backseat and witnessed the defendant attempting to ingest the remainder of the drugs. Detective Shoesmith also testified that the defendant attempted to place the "baggy" containing drugs into his mouth as the takedown team began to approach the vehicle. She stated that he refused to exit the vehicle or give his hands to the officers. Detective Loucks testified that when he arrived at the vehicle, he did so with his lights and sirens activated while wearing a jacket with several patches identifying him as a Metro Police officer. He witnessed the defendant with his right hand around his mouth, and Detective Donaldson advised him that the defendant had attempted to ingest the remaining drugs. After identifying himself as a police officer, Detective Loucks ordered the defendant "to spit it out." The defendant kept his right hand "locked" over his mouth for about thirty seconds before Detective Loucks was able to remove it. The "baggy" containing the substance was not recovered at the scene or from the defendant's person.

After placing the defendant into custody, Detectives Donaldson and Loucks field-tested the substance Detective Donaldson received from the defendant, and it tested positive for cocaine base. Special Agent Patterson confirmed that the substance she received from Detectives Donaldson, Loucks, and McDugle tested positive for cocaine base. Dr. Kleuser testified that the defendant was not exhibiting the symptoms of a drug overdose at the hospital, but he agreed that the defendant's habitual use of cocaine could have increased the defendant's tolerance level of the drug and that the plastic bag could have prevented the drug from entering the defendant's bloodstream. We conclude that the evidence was sufficient for a rational jury to find that the defendant, after seeing the blue lights and sirens and members of the takedown team approaching, swallowed the substance in an attempt to impair its availability as evidence in the drug investigation. *See* T.C.A. § 39-16-503(a)(1). Accordingly, the defendant is not entitled to relief as to this issue.

### III. Conclusion

For the above-stated reasons, we affirm the judgment of the trial court.

_____

JOHN EVERETT WILLIAMS, JUDGE